IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JEREMY S. LANGLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-3049-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security. ) | |
| ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in February 1976, completed high school, and has prior work experience as a security guard, sales clerk, warehouse worker, and stock clerk. He applied for benefits on May 9, 2007, alleging an onset date of April 5, 2007, due primarily to bipolar disorder and anger-control issues. Plaintiff first began experiencing symptoms related to these conditions as a child and they persisted through his year and a half of military service. He received an honorable discharge after attempting suicide. R. at 390.

In July 2004, Plaintiff sought treatment at Burrell Behavioral Health, complaining of mood swings, anger control problems, and depression. He was diagnosed as suffering from bipolar disorder and schizoaffective disorder and prescribed Seroquel. R. at 330-32. In September Plaintiff reported a "reemergence of agitation [and] disturbed thinking" and his prescription was changed to Zyprexa. R. at 328. Plaintiff could not tolerate the Zyprexa, so his prescription was changed to lithium. R. at 327. However,

Plaintiff did not follow the dosage instructions and took less than prescribed. He was instructed to take the dosage prescribed. R. at 326. Instead, he began taking *more* than he had been prescribed, and began experiencing hallucinations and paranoia. Plaintiff was instructed to take the lithium as prescribed and also prescribed Serquel to take as well. R. at 325. This last appointment, which took place in October 2004, was the last time Plaintiff went to Burrell Behavioral Health for several years.

In December 2004 Plaintiff went to the Houk Institute and was diagnosed as suffering from bipolar disorder, general anxiety disorder, and obsessive compulsive disorder. He was prescribed Seroquel and trileptal. R. at 163. Plaintiff returned to the Houk Institute in January 2005 and was prescribed cymbalta and trileptal. It appears that Plaintiff requested a prescription for lithium, but did not receive one. R. at 162. Plaintiff's final visit to the Houk Institute was on June 23, 2005, at which time he reported suicidal ideations and was told to go to the emergency room. R. at 161.

Plaintiff was admitted to St. John's Regional Health Center four days later and was discharged two days after being admitted. Plaintiff identified Dr. Houk as his treating physician (not anyone from Burrell Behavioral Health) and reported that he had been experiencing depression and suicidal thoughts for the past three weeks. Plaintiff reported that he had been taking lithium for eight months and it helped, but lately it seemed to have "worn off." He also reported taking Wellbutrin in the past and that he thought it was beneficial. R. at 170. On discharge he was provided prescriptions for Risperidine and lithium and his GAF score was 60. R. at 168, 176. Despite being instructed to follow up with Dr. Houk, there are no records of any subsequent visits to the Houk Institute.

In December 2005 Plaintiff went to the Jordan Valley Community Health Center and saw Dr. Jeremy Langley, complaining of back pain following a fall. In addition to treatment for back pain, Plaintiff also received a prescription for Depakote. R. at 239-40.

Plaintiff was again admitted to St. John's Regional Health Center on March 29, 2006. Plaintiff was apparently seeing Dr. Thomas Kuich for psychiatric treatment on an outpatient basis, and during a session on or around March 29 Plaintiff was

accompanied by his wife who "expressed concern about him 'not doing things at home' and forgetting to take his medicine' and" getting upset when reminded to take his medicine. Dr. Kuich recommended Plaintiff check himself into the hospital for treatment. Plaintiff's GAF at admission was 45, but with a high over the last year of 70. R. at 184-85. Plaintiff left the hospital on April 3, 2006, against Dr. Kuich's advice, which caused Dr. Kuich to sever his professional relationship with Plaintiff. When he left the hospital, Plaintiff's GAF was 60 and advised to continue taking his lithium, Wellbutrin, and Depakote and to return to Burrell Behavioral Health. R. at 179-80. Instead, Plaintiff sought treatment from Dr. Langley. On June 13, 2006, Plaintiff reported fatigue, anxiety, and depression. He told the doctor that "[h]e stopped the lithium on his own and felt better, but he still is somewhat lethargic during the day" and expressed concern that the Depakote was responsible for his fatigue. Plaintiff's dosage of Depakote was reduced. R. at 235-36.

On February 13, 2007, Plaintiff was admitted to the Hawthorne Center for psychiatric treatment. By this time he was no longer taking Depakote; doctors at Hawthorne Center recommended that he resume taking Depakote and continue taking Wellbutrin and Risperdal. R. at 269-71. He was discharged on February 16 with a GAF score of 60. R. at 267-68.

Plaintiff quit his last job in April 2007, filed his application for benefits in May 2007, and was evaluated by a psychologist (Alwyn Whitehead) on July 3, 2007. He told the psychologist he quit his job because he could not "handle being around a lot of people." The psychologist documented Plaintiff's reports about his mood, depression, and anger, indicated Plaintiff suffers from schizoaffective disorder, panic disorder, and agoraphobia, accompanied by problems relating to his social environment, and assessed Plaintiff's GAF at 40-45. He indicated Plaintiff exhibited "mildly depressed behavior," could understand and remember complex instructions, "interact in limited contact situations with the general public," could adapt to simple work environments, and was severely impaired in his ability to interact with coworkers and supervisors. R. at 219-25.

Plaintiff saw Dr. Langley on July 23, 2007, complaining that his medications were not working and that "his anxiety, depression, ADD, OCD are all getting worse." Dr. Langley noted Plaintiff's report that he had an appointment at the Burrell Center and increased Plaintiff's dosage of Wellbutrin. R. at 233-34.

A Psychiatric Review Technique Form ("PERT") was completed by a psychologist (Alan Aram) on August 22, 2007. The PERT indicates Plaintiff has no restrictions on activities of daily living, has not experienced repeated episodes of decompensation, and suffered from mild limitations in his ability to maintain social functioning and maintain concentration, persistence, and pace. R. at 244-55.

Plaintiff returned to Burrell Behavioral Health on October 18, 2007, where he was treated by a nurse practitioner, Peggy Vecoli. Plaintiff reported that his condition had improved over the last six months but that he still felt "angry and has yelled and cussed at his kids. He also feels impulsive and snappy." Plaintiff also reported that his medication made him feel drowsy. R. at 321-24. Blood tests demonstrated Plaintiff had a sub-therapeutic level of Depakote, so his dosage was increased. His dosage of Wellbutrin was decreased to address Plaintiff's "agitation." R. at 319-20. On November 15 Plaintiff said he felt "less irritable" and appeared "less depressed than anxious. . . . The psychotic symptoms are under control and his mood is more stabilized." Plaintiff also reported that altering the time of day he took Risperdal prevented him from being "over-sedated." R. at 317-18.

Also on November 15, Nurse Vecoli completed a Medical Source Statement - Mental ("MSS"). She indicated Plaintiff was markedly limited in his ability to maintain a routine without supervision or work with or near others without being distracted, moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal work-day or work-week without interruptions, or set realistic goals or plans. She also indicated Plaintiff was not limited in his ability to get along with coworkers without distracting them, maintain socially appropriate behavior, make simple work-related decisions, maintain a schedule, and understand, remember, and carry out short and simple instructions. Nurse Vecoli also opined that in the context of a normal work-week

4

Plaintiff could respond appropriately to supervision, co-workers, and usual work situations.  R. at 262-63.

On December 6, Plaintiff reported no depression, a "tiny bit" of anxiety, and some irritability.  R. at 313-14.  On January 16, 2008, Plaintiff reported "no depression, no anxiety, [and] very slight irritability."  Abilify was prescribed (with the intention of possibly eliminating the Depakote).  R. at 308-09.  On February 5, Plaintiff reported the Abilify was "working out great."  He reported minimal problems, which he was "able to manage using skills he has learned in anger management."  He was described as doing "very well" and, as planned, his dosage of Depakote was decreased.  R. at 304-05.  On April 7, Plaintiff reported continued stability and declared "[t]hings are going great."  His Depakote was reduced further.  R. at 301-02.  However, on May 14, Plaintiff reported the latest reduction in Depakote had caused some of his symptoms to return.  His Abilify and Depakote were increased.  R at 299-300.  These changes returned Plaintiff to his prior, positive condition.  R. at 297-98.  In June Plaintiff was "doing really good" and was "much less irritable."  R. at 297-98.  On October 9, Plaintiff reported forgetting his medication because his daughter had been using his pillbox.  Nurse Vecoli wrote that Plaintiff was "fairly mood-stabilized as long as he remembers to take his medications."  R. at 295-96.[1]

Less than a week later, Plaintiff attended a therapy session accompanied by his wife.  Plaintiff's problems had increased, but it was noted that Plaintiff had continued to be "forgetful about his medications, missing some doses of his multiple medications" and some of his problems were attributed to this failing.  The therapist wrote "[s]ome of this will be the patient's responsibility, particularly the non-compliance.  Nobody can take Jeremy's medications for him.  He was reminded that non-compliance may lead to consequences such as decompensation or worse, hospitalization."  R. at 293-94.  During a counseling session held on November 6, it was noted that Plaintiff "has been fairly noncompliant with treatment."  R. at 288.

---

[1]When Plaintiff returned to Burrell Behavioral Health he also began attending therapy sessions.  Reports from these sessions echo Nurse Vecoli's reports regarding Plaintiff's improvement and stability and the efficacy of his medications.

In January 2009, Plaintiff began seeing a different nurse practitioner (Hilda Buckles). At this time, Plaintiff was taking Risperdal, Depakote, Wellbutrin and Abilify, and Nurse Buckles indicated a plan to gradually decrease the Risperdal. R. at 286-87. On March 3 Plaintiff reported frequent mood swings that increased as he decreased the Risperdal. He also told Nurse Buckles that he felt calmer when his dosage of Depakote was higher. Nurse Buckles increased the dosage of Depakote and discontinued the Risperdal. R. at 284-85. Unsurprisingly (given Plaintiff's statements regarding the effect of decreasing the Risperdal), Plaintiff's bout of anger increased. Nurse Buckles increased his Depakote. R. at 282-83. Plaintiff's condition had not changed in May, but Plaintiff reported feeling calmer immediately after taking Abilify. Nurse Buckles changed the schedule for Plaintiff's taking of Abilify and indicated possibly returning to Risperdal if positive results were not achieved. R. at 280-81. There are no treatment records after May 2009.

An MSS was prepared on July 20, 2009. It was purportedly prepared by Nurse Buckles and Dr. Joseph Babin: both of their names and signatures appear on the form. However, there is no record of Dr. Babin's involvement in Plaintiff's care. In any event, the MSS indicates Plaintiff is markedly limited in his ability to understand, remember and carry out detailed instructions, concentrate for extended periods of time, maintain a schedule, make simple work-related decisions, interact with supervisors, travel in unfamiliar places or use public transportation, and complete a normal work-day or work-week. The MSS also indicates Plaintiff is moderately limited in his ability to remember locations and work-procedures, sustain a routine without special supervision, interact with the public or co-workers, respond to changes. Interestingly, at the very end the MSS also indicated Plaintiff could understand, remember, and carry out simple instructions and respond appropriately to supervision, co-workers and typical work situations. R. at 335-36.

During the hearing, Plaintiff testified that he experiences one to two serious anger episodes a week that cause him to black out for fifteen to sixty minutes. R. at 382-87. The medication he began taking in April 2008 worked well, but there were two problems: first, he frequently forgot to take his medication; second, the medication

made him extremely drowsy. R. at 379-81, 388-89. He disavowed any physical problems, but explained that he could not work because he could not be around other people without becoming angry and could not concentrate. R. at 389-92.

The ALJ noted that Plaintiff's medications were effective, but that he failed to take them as prescribed. R. at 17. He also noted that there was no Record of Plaintiff ever seeing Dr. Babin – in fact, he denied seeing anyone other than Nurse Buckles. R. at 20, 375-76. This was significant because a nurse practitioner is not considered acceptable medical sources. The ALJ also noted the opinions expressed in the July 2009 MSS were inconsistent with not only Nurse Vecoli's November 2007 MSS but were also contrary to Plaintiff's medical and treatment records. The ALJ held Plaintiff retained the capacity to maintain a "routine lifestyle" and that his "severe mental impairments" were effectively treated with medication so long as he was compliant with the treatment. When Plaintiff takes his medication he is mildly limited in his ability to understand and carry out complex instructions, work with the public, and adapt to work changes, and can "respond to coworkers and supervisors on an occasional basis relating to job process." Based on the testimony of a vocational expert, the ALJ held Plaintiff could not return to his past relevant work but retained the residual functional capacity to work as a laundry worker, furniture cleaner, and small product assembler.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a

mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff first contends the ALJ erred in failing to accord proper weight to the opinions of his treating medical professionals, particularly he MSSs prepared by the nurse practitioners.  As noted by the ALJ, nurse practitioners are not medical sources to whom deference is owed.  Nurse Buckles' MSS was signed by a medical doctor, but there is no indication that Dr. Babin had any involvement in Plaintiff's care, so Dr. Babin's signature does not transform the MSS into a treating physician's statement to whom deference is owed.  In any event, Nurse Vecoli's MSS did not support a finding of disability; while it indicated Plaintiff has limitations those limitations are far less severe than what he has described and fall short of establishing an inability to perform work.  Finally, and perhaps most importantly, the ALJ noted the MSSs were inconsistent with the contemporary treatment notes and other evidence in the Record.  E.g., Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Plaintiff has been hospitalized in the past, but was always stabilized upon receiving medication.  Substantial evidence in the Record as a whole – considerable evidence, in fact – establishes that Plaintiff's condition was ameliorated with medication and that his problems recurred because he failed to take his medication as required.  The Record also establishes that the drowsiness caused by the medication was significantly reduced as the dosages and timing were changed.

Plaintiff's second argument is that the ALJ failed to follow Social Security Ruling 82-59, which governs when failure to comply with medical directives justifies denial of a disability claim.  This ruling addresses circumstances when the mere failure to follow medical directives, without more, justifies automatic denial of a claim.  This is to be differentiated from a case in which the ALJ relies on the failure to take medication as a means to evaluate the claimant's credibility or the weight to be afforded to other relevant, related evidence.  E.g., Owen, 551 F.3d at 800 n.3; Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  In the present case, the Record established that when he took his medication, Plaintiff's condition improved to the point that his residual

functional capacity enabled him to work. The effect of medication is an important factor to consider in determining whether Plaintiff has a severe impairment that is expected to last more than twelve months and that precludes the claimant from working. The failure to comply with treatment is a factor in evaluating a claimant's credibility. E.g., Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). The Record reflects that Plaintiff's "forgetting" to take his medication struck the AL as somewhat odd under the circumstances. R. at 379. This is particularly important given that Plaintiff's testimony was inconsistent with his statements after he began receiving treatment, and in some respect he testified to effects (e.g., blackouts) that were never mentioned to treating professionals.

### III.  CONCLUSION

Review of the Record as a whole reveals substantial evidence supporting the ALJ's decision. Accordingly, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: January 25, 2011  UNITED STATES DISTRICT COURT